AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture

# United States District Court
### for the
### District of Arizona

| | | |
|---|---|---|
| In the Matter of the Seizure of: *(Briefly describe the property to be seized)*<br><br>The contents of Western State Bank account number 2000000810, held in the name of FYPM Funding LLC | ) ) ) ) ) ) ) ) ) ) | Case No. 22-9121 MB |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the District of Arizona be seized as being subject to forfeiture to the United States of America. The property is described as follows:

    The contents of Western State Bank account number 2000000810, held in the name of FYPM Funding LLC

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before __5/12/2021__
                                                                                                                        *(not to exceed 14 days)*

☒ in daytime - 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

    Unless delayed notice is authorized below, you must also give a copy of the warrant and receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to any United States Judge on criminal duty in Arizona.

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be search or seized *(check the appropriate box)*

    ☐ for ___ days *(not to exceed 30).* ☐ until the facts justifying, the later specific date of _____

Date and time issued: __4/28/2021 @ 3:53pm__            *ESWillett*
                                                                                                     *Judge's signature*

City and State: __Phoenix, AZ__                 __Honorable Eileen S. Willett, U.S. Magistrate Judge__
                                                                                                *Printed name and title*

AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture

# United States District Court
for the
District of Arizona

| | | |
|---|---|---|
| In the Matter of the Seizure of: *(Briefly describe the property to be seized)* <br><br> The contents of Western State Bank account number 2000000810, held in the name of FYPM Funding LLC | ) ) ) ) ) ) ) | Case No. 22-9121 MB |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe the following property in the District of Arizona is (a) property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity including but not limited to 21 U.S.C. § 841, *et seq.* (Drug Trafficking); and property, real or personal, involved in a transaction or attempted transaction in violation 18 U.S.C. § 1956 and/or 1957 (Money Laundering); (b) subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. §§ 853(e) and (f) and 881; and (c) subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and 982(a)(1), 21 U.S.C. §§ 853(a) and 881(a) and 28 U.S.C. § 2461. *(describe the property):*

The contents of Western State Bank account number 2000000810, held in the name of FYPM Funding LLC

The application is based on these facts:

See Affidavit of Drug Enforcement Administration (DEA) Task Force Officer (TFO) Anthony C. Morse

☐ Continued on the attached sheet.

ANTHONY MORSE (Affiliate)
Digitally signed by ANTHONY MORSE (Affiliate)
Date: 2022.04.28 12:10:27 -07'00'

*Applicant's signature*

MARK WENKER
Digitally signed by MARK WENKER
Date: 2022.04.28 11:16:18 -07'00'

Approved by AUSA Mark J. Wenker

Anthony C. Morse, DEA TFO, Affiant
*Printed name and title*

Sworn to telephonically.

Date: 4/28/2022 @ 3:53pm

*Judge's signature*

City and State: Phoenix, Arizona

Honorable Eileen S. Willett, U.S. Magistrate Judge
*Printed name and title*

22-9121 MB

# AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Anthony C. Morse, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being duly sworn under oath, depose and say:

## I. INTRODUCTION

1. I have been a TFO with the DEA since August 2008. As such, I am a "federal law enforcement officer" as defined in Federal Rules of Criminal Procedure 41. Prior to my assignment to DEA, I was assigned to the Scottsdale Police Department Special Investigations Section for five years. Four of those years I served as a narcotics detective, and for one year I served as a detective in a conspiracy unit.

2. I am presently assigned to DEA Phoenix Field Division's Strike Force Group 1 (DEA SF1). As a TFO of the DEA, my duties and responsibilities include conducting criminal investigations of large-scale drug-trafficking organizations (DTOs). I have previously participated in investigations which resulted in the arrests, searches, and seizures of individuals and property. I have participated in the use of cooperating informants, undercover agents, pen register/trap and trace devices, video surveillance, wiretaps, Global Positioning Satellite (GPS) tracking devices, search warrants, and audio surveillance, among other law enforcement techniques, during my career as a TFO and Scottsdale (Arizona) Police Department Detective.

## II. PURPOSE OF THIS AFFIDAVIT

3. This affidavit is submitted in support of an application for a seizure warrant to seize the following:

**All funds in Western State Bank account number 2000000810, held in the name of FYPM Funding LLC**

(the "FYPM Account"). The FYPM Account was opened in Arizona.

4. There is probable cause to believe that the FYPM Account (a) contains property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, including a drug trafficking offense, 21 U.S.C. § 841, *et seq.* and is property, real or personal, involved in a transaction or attempted transaction in violation of

1

a money laundering offense, 18 U.S.C. § 1956 and/or 1957; (b) is subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(e) and (f); and (c) is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1), 21 U.S.C. §§ 853(a) and 881(a), and 28 U.S.C. § 2461.

### III.      **BACKGROUND AND INVESTIGATION**

5. Based on my training, experience, and participation in drug trafficking and computer-related investigations, I know and have observed the following:

   a. I have learned about the manner in which individuals and organizations distribute controlled substances in Arizona as well as in other areas of the United States;

   b. I know drug traffickers often purchase and/or title assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

   c. I know drug traffickers must maintain on-hand large amounts of U.S. currency to include stored in financial accounts readily accessible in order to maintain and finance their ongoing drug business;

   d. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

   e. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants,

casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency; and

f.  I know that cryptocurrency and cryptocurrency accounts are often times used by drug traffickers to launder money or conceal drug proceeds because of the anonymity associated with use of cryptocurrency and cryptocurrency accounts and because cryptocurrency is decentralized.

### *Investigation of Salvatore Frank Vaccaro*

6. Since October 2020, the DEA Phoenix Field Division's Strike Force Group 1 has been investigating Salvatore Frank Vaccaro ("VACCARO") for drug trafficking and money laundering for a Transnational Criminal Organization ("TCO") based in Scottsdale, Arizona.

7. VACCARO, a Canadian citizen, was admitted into the United States June 12, 2019, under admission code B1 (B1 Visa). Under a B1 Visa, VACCARO was authorized to remain in the United Stated for six months. VACCARO's B1 expired on December 11, 2019. Under the B1 Visa program, VACCARO is allowed the opportunity to petition to remain in the United States for an additional six months. VACCARO has no petitions on record requesting this extension and therefore should have departed the United States on or before December 11, 2019.

8. The investigation of VACCARO and the TCO has led to the identification of members of the TCO, as well as the identification of at least one law enforcement drug seizure associated with the TCO and VACCARO. The seizure of approximately 64 kilograms of cocaine occurred in June 2019 by the DEA Los Angeles Field Division Southwest Border 2 ("SWB2") from a member of the VACCARO TCO, as further detailed below.

9. On June 5, 2019, SWB2 was conducting surveillance operations on an ongoing investigation involving a Drug Trafficking Organization ("DTO") trafficking narcotics in the Los Angeles, California area. During surveillance, officers observed a subject ("Subject1"), who has since been charged with a drug trafficking offense, meeting a third party

in a shopping center parking lot in Ontario, California. Surveillance officers observed Subject1 hand a duffle bag to the third party who then gave a brown box to Subject1.

10. Surveillance officers conducted a traffic stop on Subject1 as he left the parking lot. During the stop, officers seized approximately 64 kilograms of cocaine in the brown box. Subject1 was arrested on state of California narcotics charges.

11. Following the arrest of Subject1, officers conducted a recorded interview with Subject1 regarding the seizure of the cocaine. Subject1 was advised of his *Miranda* rights and given a *Miranda* warning form which he signed.

12. During the interview, Subject1 indicated the cocaine was destined for Canada and that the transaction was coordinated by "Salvador Francesco Viccaro" (believed to be VACCARO), a Canadian citizen living in Arizona.

13. Subject1 stated that beginning in February or March of 2019 Subject1 had picked up cocaine for VACCARO on four previous occasions in the Los Angeles, California area.

14. Subject1 stated that once Subject1 picked up the cocaine, Subject1 would deliver it to an unknown courier who would then deliver it to a commercial truck driver for transport to Canada.

15. Subject1 stated that the largest amount of cocaine that he picked up was 212 kilograms in Los Angeles approximately two months prior to his arrest.

16. Subject1 told the officers VACCARO followed him to California from Arizona each time, and they stayed at the same hotel in separate rooms. According to Subject1, VACCARO would physically open each kilogram of cocaine and do a quality check of the cocaine.

17. Subject1 stated VACCARO resided at 8739 E. Quartz Mountain Drive, Gold Canyon, Arizona.

18. Subject1 stated that VACCARO had up to six cellular phones that he would use but Subject1 only had one number saved in his Samsung cellular telephone.

19. Subject1 verbally consented to a search of his cellular phone and provided VACARRO's phone number (###) ###-7985.

20. Investigators submitted an administrative subpoena to AT&T for Subscriber information for telephone number (###) ###-7985. The AT&T response revealed (###) ###-7985 was a prepaid phone active from May 7, 2019, to July 7, 2020, with no subscriber listed.

21. Based upon training and experience, investigators know that drug traffickers often use prepaid phones with no subscriber information listed in order to thwart law enforcement efforts at locating and identifying the user of the phone.

22. Toll records for (###) ###-7985 from June 26, 2020, to October 20, 2020 identified thirty-three contacts with telephone number (###) ###-8464 from June 26, 2020, to October 14, 2020. The telephone number (###) ###-8464 was subscribed to someone who has been identified as a source of supply for cocaine and was involved in a 100-kilogram cocaine seizure in August 2020 ("Subject2").

23. Investigators conducted a query of a law enforcement database on VACCARO in October 2020. The query revealed VACCARO's address at the time was 29501 N. 76th St., Scottsdale, Arizona. A query of the City of Scottsdale water billing customer database for 29501 N. 76th St. revealed VACCARO as a renter at the address receiving water service from the City of Scottsdale. VACCARO provided telephone number (###) ###-7985 to the City of Scottsdale as his contact number for the account. This was the same number for VACCARO that Subject1 provided following his arrest.

24. VACCARO had communications with Subject1 about cocaine trafficking.

25. On November 1, 2020, investigators conducted a trash pull at VACCARO's residence located at 29501 N. 76th St., Scottsdale, Arizona. The trash bin was placed out for collection next to the road.

26. In the trash, investigators located an Alcatel Go Flip 3 T-Mobile box, a United Airline Flight baggage claim ticket dated October 11, 2020, for someone who is believed to be

Subject2, and a clear heat-sealed vacuum bag that appeared to have been cut open, with "$20" written in black ink on the outside of the bag.

27. Based on training and experience, investigators know that drug traffickers often vacuum seal drug proceeds for transport and/or storage and often write the amount of currency contained in the vacuum sealed bag on the outside of the bag. In this instance, "$20" would likely be for $20,000 of drug proceeds.

28. The use of cellophane to wrap money or vacuum sealing money is a significant indication the money has a nexus to drug trafficking. *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 982 (9th Cir. 2002). Drug traffickers vacuum seal drug proceeds to minimize the risk of detection of narcotic odors on the currency by certified drug canines.

29. VACCARO's banking records indicate he was in California at the time of Subject1's arrest. VACCARO's debit card was utilized on May 30, 2019, at a Starbucks in Rancho Cucamonga, California and was also utilized at a Chevron in Calimesa, California on June 5, 2019, the date that Subject2 was arrested in California, which corroborates Subject1's statement that VACCARO followed Subject1 to California from Arizona each time a shipment of cocaine was to occur.

30. VACCARO has no known employment, has no known legitimate business, and his family in Canada has never had any wealth.

***Purchase of 6216 N. 38th Place, Paradise Valley, Arizona***

31. On September 30, 2020, VACCARO purchased 6216 N. 38th Place, Paradise Valley, Arizona 85253 for $3,500,000 (the "Paradise Valley Home").

32. VACCARO made two down payments totaling $2,034,278 and obtained a mortgage in the amount of $1,500,000. The down payments were sent to WFG National Title Insurance Agency in two separate wire transfers.

33. According to bank records, the first wire transfer occurred on September 21, 2020 in the amount of $100,000 and was funded by an account at US Bank titled Simmons and Gottfried PLLC.

34. The second wire transfer occurred on September 30, 2020, in the amount of $1,934,278.25, and was funded by an account at US Bank titled Simmons and Gottfried PLLC Lawyers Trust Account (IOLTA).

35. The original source of the funds that VACCARO used for the down payment was a cash deposit totaling $2,999,940 into a US Bank account of Simmgott Properties LLC.

36. On September 15, 2020, VACCARO and his attorney, JS, brought two suitcases and two duffle bags containing United States currency into the US Bank branch in Phoenix, Arizona.

37. The currency was in vacuum sealed bags with rubber bands binding numerous stacks of currency. The majority of the currency was twenty-dollar ($20) denominations (totaling $2,748,680) and the remaining currency was in $100, $50, $10, and $5 denominations.

38. As previously indicated, vacuum sealing money is a significant indication money has a nexus to drug trafficking. Moreover, a large amount of money with vast majority of the bills in the twenty-dollar denomination is evidence that the money is drug-related. *United States v. $27,800 in United States Currency*, 2017 WL 6345394, at *4 (S.D. Cal. Dec. 8, 2017); *United States v. Approximately $17,872 in United States Currency*, 2009 WL 2990496, at *3 (N.D. Cal. Sept. 11, 2009) (stating the use of small denominations contributes to finding money is connected to illegal activity).

39. The $2,999,940 in cash that VACCARO deposited into the US Bank account and thereafter used to make the down payment on the Paradise Valley Home was proceeds of, or connected to, drug trafficking.

***Purchase of Luxury Vehicles***

40. Although VACCARO has no known source of legitimate income, from 2019 through 2022 he has purchased (with cash) or leased many expensive cars, including:

    a.     2021 Mercedes Benz (VIN: W1K6X7GBXMA042090);

    b.     2018 Can-Am (3JBVXAW41JK004198);

    c.     2017 BMW X5 (5YMKT6C30H0U39534);

7

  d.  2008 Extreme Boat (5DBBB34388R000011);

  e.  2019 McLaren (SBM15ACA4KW800100);

  f.  1999 Blue Nissan (BNR34004691);

  g.  2009 black Mercedes Benz SL (WDBSK79F59F158216);

  h.  2008 Black Porsche 911 (WP0AD29998S796186);

  i.  2015 Black Porsche 911 (WP0CA2A19FS800340);

  j.  2021 Black Lamborghini Aventador (ZHWUN6ZD2MLA10474);

  k.  2021 Black Ram 1500 TRX (1C6SRFU98MN705736);

  l.  2021 custom motorcycle (AZ381807);

  m.  2021 custom motorcycle (AZ379594);

  n.  2021 Black Ram 1500 TRX (1C6SRFU99MN905816);

  o.  2020 Black Range Rover (SALGW2RE1LA579837);

  p.  2018 McLaren (SBM14DCAXJW001585);

  q.  2018 Rolls Royce (SCA666D50JU115829);

  r.  2017 Mercedes (WDDWJ8HB3HF463468);

  s.  2018 Porsche (WP0AE2A94JS185285);

  t.  2016 Lamborghini (ZHWUF3ZD6GLA04984);

  u.  2019 Lamborghini Urus (ZPBUA1ZL8KLA03725); and

  v.  2020 Ferrari (ZFF90HLA9L0250501).

***Vaccaro Conflicting Statements Regarding Source of His Wealth***

  41.  In March of 2021, VACCARO purchased the 2008 black Porsche 911 (¶40(h) above) from Darren Joyce for $290,000.

  42.  Joyce stated that VACCARO paid cash for the vehicle and the transaction took place within an office of Launch Auto Sports in Scottsdale, Arizona.

  43.  Joyce stated the cash, mostly in 20 and 100-dollar bill denominations, was in vacuum sealed packages with rubber bands.

44. VACCARO told Joyce that he (VACCARO) was involved in commercial real estate and construction.

45. VACCARO is not involved in commercial real estate and construction.

46. On June 11, 2021, VACCARO purchased the 2021 Dodge TRX (¶40(k) above) from Pro Motorsports in Scottsdale, Arizona for $108,000 and paid cash for it.

47. VACCARO told the seller that he stocked ATM's and that was why he had a lot of 20-dollar bills.

48. VACCARO has never stocked ATM's.

49. On July 12 2021, VACCARO purchased a 2021 Dodge TRX (¶39(n) above) from Mark Mercado for $85,000 and paid cash for it.

50. VACCARO told Mercado that he (VACCARO) made most of his money from a 3.5-million-dollar sale of a legal marijuana grow in California.

51. VACCARO also told Mercado he also used to build homes in Canada for a living.

52. VACCARO has never sold 3.5 million dollars of legal marijuana in California, and upon information and belief he has never built homes in Canada for a living.

53. VACCARO purchased three motorcycles from Corey Mauck and paid a total of $112,000 in cash for them.

54. John Barbuto owns Launch Auto Sports in Scottsdale, Arizona. VACCARO contacted Barbuto in 2020 via Instagram.

55. Barbuto advised when he first met him, VACCARO owned the following vehicles: a McLaren Senna, McLaren P1, Ferrari, Rolls Royce, Bentley, and a Lamborghini. The Senna was worth approximately 1.2 million dollars and the McLaren P1 was worth approximately 1.3 million dollars.

56. VACCARO initially told Barbuto that he (VACCARO) had a partner that started a business in Asia that conducted international wire transfers.

57. VACCARO later told Barbuto that he was in construction and had a company in Canada.

58. Barbuto also heard VACCARO say that he was a hard money lender.

59. VACCARO has never been in the business of international wire transfers, construction in Canada, or hard money lending.

60. VACCARO asked Barbuto to deposit $500,000 cash into Barbuto's bank account. While setting up the deposit with his bank, the bank advised Barbuto that the bank could send a Brink's truck the following day and, the bank needed VACCARO's driver's license to complete the deposit.

61. When Barbuto told VACCARO the bank needed his driver's license, VACCARO no longer wanted to make the deposit.

62. VACCARO's reluctance to provide his driver's license to the bank in order to make the deposit is evidence the $500,000 was connected to drug trafficking.

63. Throughout the investigation of VACCARO, investigators served numerous subpoenas on bank accounts used by VACCARO, conducted surveillance on VACCARO and interviewed numerous associates of VACCARO. The investigation has not uncovered any evidence to support a legitimate source of income for VACCARO.

64. VACCARO has given numerous conflicting statements as to the source of his funds. VACCARO has falsely claimed the source of his income and money to be from construction in Canada, servicing ATM machines, selling legal marijuana in California, hard money lending, and international wire transfers.

65. VACCARO's inconsistent, contradictory, and false statements about the source of his money is evidence that the money is drug trafficking related and subject to forfeiture. *See United States v. $242,484.00*, 389 F.3d 1149, 1164 (11th Cir. 2004) (finding claimant's inconsistent statements and changing stories are evidence of forfeitability); *United States v. $22,474.00*, 246 F.3d 1212, 1217 (9th Cir. 2001) ("[Claimant's] inconsistent statements about the money and his reasons for being in Phoenix tended to support an inference that the money was drug-related."); *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir.

1992) ("[M]isstatements are probative of possible criminal activity."); *United States v. $105,180 in U.S. Currency*, 2013 WL 2153326, at *9 (D. Ariz. May 17, 2013).

### *MB and C Plus Holdings LLC*

66. MB is a partial owner of Launch Auto Sports and a custom home builder.

67. MB met VACCARO in September 2020. VACCARO told MB he had a background in construction in Toronto.

68. VACCARO has never worked in construction in Toronto.

69. VACCARO asked MB to come see the Paradise Valley Home and give a bid to remodel it. At this time, VACCARO was staying in a rental property for $10,000 per month.

70. VACCARO hired MB to start the remodel in October 2020, and initially gave MB $150,000 in rubber banded cash to get started. MB used some of the money to pay subcontractors and he deposited some of the cash in his bank account.

71. MB later told investigators that VACCARO gave him two additional cash payments of approximately $100,000 each.

72. MB said in total they probably had $700,000 invested in the remodel, and some of the money was MB's money.

73. VACCARO asked MB how much he should put into the Paradise Valley Home to flip it and MB suggested it would be over one million dollars.

74. VACCARO told MB he had one to 1.5 million dollars but wouldn't have money to live on if he spent it all. MB suggested getting a partner on the property. VACCARO agreed it would be best to pay off the house and give it to MB who could then get a home equity loan.

75. VACCARO had to deed the home to MB because VACCARO did not have a social security number and he could not qualify for the loan.

76. According to public records, on February 8, 2021, VACCARO executed a Quit Claim Deed and transferred ownership of the Paradise Valley Home to C Plus Holdings LLC. MB is the sole member of C Plus Holdings LLC.

77. On February 8, 2021, C Plus Holdings LLC obtained a revolving credit line from Western State Bank in the amount of $2,800,000, using the Paradise Valley Home as collateral to secure the loan. MB has stated that the reason for the large loan was because VACCARO told him he (VACCARO) would need 1.3 million for living expenses.

78. MB said he and VACCARO opened three joint accounts at Western State Bank under C Plus Holdings LLC. The first was associated with the Paradise Valley Home, opened to deposit the funds from the eventual sale of the house.

79. The second account was an investment account. MB and VACCARO deposited 2.5 million in this account from the home equity line of credit.

80. The third and final joint account was an operating account. VACCARO began using the investment account and operating account as his personal accounts and used the money to buy and sell cars.

### *Purchase of the 521 Holiday Drive, Hallandale FL*

81. On November 15, 2021, VACCARO purchased the 521 Holiday Drive, Hallandale, FL. The purchase price was $4,500,000. VACCARO obtained a loan to complete the purchase of the property through Homebridge Financial Services.

82. As part of the purchase, on September 28, 2021, VACCARO wire transferred $250,000 (earnest money) from a C Plus Holdings LLC account at Western State Bank. On November 12, 2021, VACCARO wired $1,315,000 from a C Plus Holdings LLC account at Western State Bank.

83. These wire transfers from the C Plus Holdings LLC account are traceable to the revolving line of credit secured by the Paradise Valley Home, which VACCARO purchased with drug trafficking proceeds.

### *Opening of FYPM Account with Drug Trafficking Proceeds*

84. VACCARO opened the FYPM Account and he is the signatory on the account. Based on records obtained from Western State Bank regarding the Operating Account for C Plus

Holdings LLC, VACCARO made the following transfers from the Operating Account into the FYPM Account:

December 17, 2021, - $25,000

January 12, 2022, - $10,000

January 20, 2022, - $30,000

February 2, 2022, - $100,000

March 8, 2022, - $200,000

Total: $365,000

85. As described previously, the majority of the funds for the C Plus Holdings LLC Operating Account originated from the $2,500,000 draw from the home equity line of credit on the Paradise Valley Home, which VACCARO purchased with drug trafficking proceeds, and into the C Plus Holdings Investment Account. Investigators reviewed bank records and found on January 18, 2022, $55,000 was drawn from the home equity line of credit and deposited into the C Plus Holdings Operating Account. Also, on January 25, 2022, $225,000 was drawn from the home equity line of credit and deposited into the C Plus Holdings Operating Account. VACCARO's drug trafficking proceeds were used to buy the Paradise Valley Home; VACCARO (through C Plus Holdings LLC) was able to obtain a home equity line of credit because of the equity he accumulated as a result of those drug trafficking proceeds; and VACCARO (through C Plus Holdings LLC) drew upon that line of credit and transferred the funds to his FYPM Account.

86. The funds in the FYPM Account are traceable to the proceeds of VACCARO's drug trafficking. The Account also has been used to launder his drug trafficking proceeds.

## IV. **CONCLUSION**

87. Based upon the foregoing, probable cause exists to believe that the FYPM Account (a) contains property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, including a drug trafficking offense, 21

U.S.C. § 841, *et seq.* and is property, real or personal, involved in a transaction or attempted transaction in violation of a money laundering offense, 18 U.S.C. § 1956 and/or 1957; (b) is subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(e) and (f); and (c) is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1), 21 U.S.C. §§ 853(a) and 881(a), and 28 U.S.C. § 2461.

ANTHONY MORSE (Affiliate)
Digitally signed by ANTHONY MORSE (Affilia
Date: 2022.04.28 12:16:09 -07'00'

Anthony C. Morse, Task Force Officer
Drug Enforcement Administration

X Sworn by Telephone

SUBSCRIBED AND SWORN to before me this 28 day of April 2022   @3:53pm

*EsWillett*

Honorable Eileen S. Willett
United States Magistrate Judge